## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT WIEDMAIER,
  4313 Saul Road
  Kensington, MD 30896,

     *Plaintiff,*

     v.

OPENTABLE, INC.,
  1 Montgomery Street, Suite 700
  San Francisco, CA 94104;

BOOKING HOLDINGS INC.,
  800 Connecticut Avenue,
  Norwalk, CT 06854; and

CHUCK TEMPLETON
  440 N. Wells Street, Suite 720
  Chicago, IL 60654,

     *Defendants.*

Case No. 19-cv-1063

## COMPLAINT

Plaintiff Robert Wiedmaier, by and through his attorneys, alleges the following on knowledge with respect to himself and his own conduct and interactions, and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.     This case arises out of Defendant OpenTable, Inc.'s ("OpenTable") broken promises to Chef Robert Wiedmaier when OpenTable was a fledgling company working with Mr. Wiedmaier to build itself into the multibillion dollar company it is today.

2.     As a startup, OpenTable used Mr. Wiedmaier as an "influencer"—a well-known restaurateur whose early use and promotion of OpenTable's restaurant reservation services

helped the company establish itself in the Washington, D.C. area.  Mr. Wiedmaier's restaurant

Marcel's was one of the first in the region to use OpenTable.  Mr. Wiedmaier worked regularly

and directly with OpenTable's representatives, and served as one of the company's foremost

evangelists in the Washington, D.C. area.

3.      When Mr. Wiedmaier encountered serious problems with the service in 2001,

however, he was prepared to end his relationship with OpenTable.  To induce Mr. Wiedmaier not

to drop OpenTable, its CEO Chuck Templeton travelled to Washington, D.C. and promised Mr.

Wiedmaier 40,000 shares in the company, along with a perpetual fee reduction for OpenTable's

services, if he agreed to continue using the product.  Those promises were intended to, and did in

fact, induce Mr. Wiedmaier to continue using OpenTable at his restaurant.  He also continued

promoting the company's reservation system.

4.      Years later, when Mr. Wiedmaier attempted to exercise his rights to be paid for

his 40,000 OpenTable shares pursuant to The Priceline Group, Inc.'s ("Priceline") tender offer to

purchase OpenTable, the company claimed that there was no record of Mr. Wiedmaier having

shares in OpenTable and refused his demand.

5.      Mr. Wiedmaier brings this action to recover the value of the shares he was

promised by OpenTable and Templeton.

**THE PARTIES**

6.      Plaintiff Robert Wiedmaier is a United States citizen who resides in Maryland.

7.      Defendant Opentable, Inc. is a corporation incorporated under the laws of

Delaware and maintains its principal place of business at 1 Montgomery Street, Suite 700, San

Francisco, California 94104.  OpenTable is a wholly-owned subsidiary of Booking Holdings Inc.

8.      Defendant Booking Holdings Inc. ("Booking Holdings") is a corporation

incorporated under the laws of Delaware and maintains its principal place of business at 800

Connecticut Avenue, Norwalk, Connecticut 06854.  Booking Holdings is a public company with

shares listed on NASDAQ.  Booking Holdings was formerly known as The Priceline Group, Inc.

9.      Defendant Chuck Templeton is a United States citizen who resides in Illinois.  He

was the Chief Executive Officer of OpenTable from 1998 to 2004.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is

complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of

costs, interest, and attorney's fees.

11.     This Court has general personal jurisdiction over Defendants OpenTable and

Booking Holdings because they regularly transact business in this District.  OpenTable, Booking

Holdings, and Templeton also engaged in conduct in this District upon which Plaintiff's claims

are based and therefore are subject to this Court's specific personal jurisdiction.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) for the

forgoing reasons and because a substantial part of the events, acts, and omissions giving rise to

Plaintiff's claims occurred in this District.

## BACKGROUND FACTS

**I.      Robert Wiedmaier Is the Chef and Proprietor of One of Washington, D.C.'s Best Restaurants, Marcel's.**

13.     For nearly two decades, Robert Wiedmaier has been one of Washington, D.C.'s

most prominent and celebrated chefs.

14.     Since working as a dishwasher in his teens, Mr. Wiedmaier has spent most of his

life in restaurants.  Mr. Wiedmaier attended culinary school and apprenticed at a two-star

Michelin restaurant in the Netherlands before moving to the United States in 1986 to become a

saucier at a prominent Washington-area restaurant, Le Chardon d'Or.  In a little over a decade,

he had risen to become the Head Chef at the Watergate Hotel.

15.      In 1999, Mr. Wiedmaier struck out on his own and opened Marcel's, a fine dining

restaurant in Washington, D.C.  Marcel's has been critically and popularly acclaimed almost

since day one.  Marcel's received excellent reviews in Washingtonian Magazine and the

Washington Post Magazine in October 1999, and was included in the Washington Post

Magazine's "Annual Dining Guide" in 1999, and Washingtonian Magazine's annual "100 Very

Best Restaurants" list in 2000 and 2001.  The restaurant has continued to receive excellent

reviews and has remained on lists of Washington, D.C.'s best restaurants ever since.

16.      Mr. Wiedmaier has gone on to start several other successful restaurants.  He is a

partner in RW Restaurant Group, LLC, which owns and operates several restaurants, and he

consults with others in the industry.  Marcel's remains the company's, and Mr. Wiedmaier's,

flagship restaurant.

17.      In addition to his restaurant work, Mr. Wiedmaier engages in significant

philanthropic work.  Mr. Wiedmaier co-created the Virginia Wiedmaier Holiday Dinner, an

annual fundraising dinner for wounded warriors, in 2004, and he regularly participates in (and

cooks for) the Blue Star Families Neighbors Celebration, a fundraising event for military

families.

## II.      As a Startup, OpenTable Relied on Influencer Restaurateurs to Help It Achieve Success.

18.      OpenTable, an online restaurant reservation company based in San Francisco, was

founded by Chuck Templeton in 1998.  The company provides reservation management software

to restaurants, and allows potential diners to search for and make reservations online, both at the

OpenTable.com website and elsewhere, including on restaurants' own websites.

19.     As a startup, OpenTable's strategy was to establish itself in select major American cities before expanding more broadly.  OpenTable started by offering its services to restaurants in San Francisco and Chicago in 1999, and then expanded to New York City and Washington, D.C.

20.     OpenTable had a two-stage plan to achieve success when entering a new city. The restaurant reservation business is a two-sided market with restaurants on one side and diners on the other; to succeed, a service needs participants on both sides.  But such a business faces a dilemma: the service is valuable to participants on one side only if there are participants on the other side.  An online reservation service without restaurants would not attract diners, and a service without diners would not attract restaurants.

21.     OpenTable solved this problem by "seeding" one side of the market.  In the first stage of its plan, the company sought out a handful of prominent chefs or restaurateurs— "influencers," as founder and CEO Chuck Templeton referred to them—to manage their reservations through OpenTable.

22.     As in life, in the restaurant business restaurateurs tend to want to emulate the popular crowd.  In stage two, therefore, OpenTable parlayed its status as the reservation management system for influencer restaurants to rapidly gain market share among restaurants in a given city.  This in turn attracted more diners, and increased OpenTable's "conversion rate"— the percentage of potential diners who made a reservation after searching the site—which made the company's services more attractive to restaurants.

23.     OpenTable's strategy of starting with a small core of influencer restaurateurs resulted in a strong network of restaurants and diners, and ultimately built OpenTable into the multibillion dollar company it is today.

**III.    Marcel's Became One of the First Restaurants in Washington, D.C. to Use OpenTable, and Mr. Wiedmaier Actively Promoted the Software to Fellow Chefs.**

24.    When Marcel's opened, it—like most other restaurants at the time—used a paper ledger system to make and keep reservations.  Under this system, an employee would man the phones, and when a customer called to make a reservation, the employee would hand-write the reservation information into a ledger.

25.    In or around early 2001, OpenTable sought to establish itself in the Washington, D.C. market.  Pursuant to its market development plans, its first step was to sell its service to a handful of influencer chefs in the region.

26.    Robert Wiedmaier was one of those influencers.  In or around March or April 2001, OpenTable's Director of Strategic Accounts, Michael Schell, approached Mr. Wiedmaier and Thomas Burke, the restaurant's General Manager, about using OpenTable's software to manage the reservation system at Marcel's.

27.    Mr. Wiedmaier agreed to begin using OpenTable to manage the restaurant's reservations.  At that time, Marcel's was one of the first restaurants in Washington using OpenTable.

28.    In addition to utilizing Mr. Wiedmaier's influencer status, OpenTable and Mr. Schell used Marcel's to showcase OpenTable's capabilities.  Mr. Schell often brought restaurateurs to Marcel's to show them how the system worked.  And on numerous occasions, Mr. Schell referenced Mr. Wiedmaier's use of OpenTable at Marcel's as a selling point when approaching new restaurateurs about the software.

29.    At Mr. Schell's urging, Mr. Wiedmaier also agreed to act as a de facto ambassador for OpenTable around Washington, D.C.  Having worked in the restaurant industry

in Washington for many years, Mr. Wiedmaier was personal friends with numerous chefs and restaurateurs in the region, and he introduced OpenTable to many of them.

**IV.     An OpenTable Malfunction Caused Marcel's to Lose All of Its Reservations.**

30.     In or around late April 2001, OpenTable's system at Marcel's crashed, causing the restaurant to lose all of its reservations.  This caused serious problems for Marcel's because it had no other record of customers' reservations and no way to know which reservation times were still available for new customers.

31.     Numerous customers showed up at what they had believed were their reservation times, but the OpenTable system did not show their reservations.  Timing is crucial in the restaurant business—particularly in fine dining restaurants like Marcel's—and while the restaurant attempted to accommodate them, many customers were unhappy.

32.     Marcel's lost business because of OpenTable's failures.

33.     Mr. Wiedmaier was upset with OpenTable and planned to stop using the software.

34.     Mr. Wiedmaier spoke to Mr. Schell to express his displeasure.  Mr. Wiedmaier explained that as a result of the problems that OpenTable caused, he was going to stop using the company's services at Marcel's.  He also indicated that he would tell his colleagues in the restaurant community about what happened and would suggest that they not use OpenTable either.

35.     Mr. Schell told Mr. Wiedmaier that OpenTable's CEO Chuck Templeton planned on personally coming to Washington, D.C. to speak to him and resolve his concerns.

**V.     Opentable's CEO Offered Mr. Wiedmaier Shares in OpenTable in Exchange for Him Not Terminating OpenTable's Services at Marcel's.**

36.     In or around May 2001, Mr. Templeton visited Marcel's to meet with Mr. Wiedmaier and Mr. Burke and discuss the issues Marcel's had been having with OpenTable.

Mr. Wiedmaier explained to Mr. Templeton that the restaurant was losing business as a result of

OpenTable's problems, and made clear his extreme displeasure with the situation.  Mr.

Wiedmaier indicated that he was particularly irritated with OpenTable's failures because he had

been personally promoting the software to his colleagues within the chef community.  Mr.

Wiedmaier reiterated that he was ready to stop using OpenTable and cease promoting its

services.

37.     Mr. Templeton told Mr. Wiedmaier that OpenTable would be able to permanently

fix the issues Marcel's had been having.  Mr. Templeton expressed his appreciation for what Mr.

Wiedmaier had done for OpenTable in Washington, D.C., and asked Mr. Wiedmaier to give

OpenTable another chance.

38.     In exchange for Mr. Wiedmaier continuing to use OpenTable at Marcel's, Mr.

Templeton offered Mr. Wiedmaier shares in OpenTable, and a reduction in perpetuity for certain

OpenTable fees.

39.     To document OpenTable's end of the bargain, Mr. Templeton, on behalf of

OpenTable, handed Mr. Wiedmaier two pieces of paper, each bearing OpenTable letterhead.

The first stated that Mr. Wiedmaier was being awarded 40,000 shares in OpenTable.  The second

detailed the fee reduction.[1]

40.     Since this meeting, Mr. Wiedmaier has never done anything to sell or otherwise

dispose of the OpenTable shares he had been given.

41.     As a result of the agreement, to this day Marcel's does not pay OpenTable's

standard $0.25 fee per reservation made through OpenTable directly on the restaurant's website.

---

[1] At some point in the intervening years, Mr. Wiedmaier lost these two documents.  His
significant efforts to find them have been unsuccessful.

**VI.     OpenTable Went Public, and Then Was Purchased by Priceline by Tender Offer.**

42.     OpenTable held its initial public offering on May 21, 2009.

43.     In or around July 2014, Priceline made a tender offer to OpenTable's shareholders to purchase all of the shares of common stock of OpenTable at $103.00 per share.  Per the tender offer, "[a]t the Effective Time [when Priceline completes its acquisition of OpenTable], each Share then outstanding … will be converted into the right to receive the Offer Price [$103.00], without any interest, less any applicable withholding taxes."  The tender offer was successfully completed on July 24, 2014, and Priceline acquired OpenTable for $2.6 billion in cash.

**VII.    Mr. Wiedmaier Was Denied His Right to Receive Priceline's Tender Offer Price for Each Share He Was Granted in OpenTable.**

44.     In or around September 2017, Mr. Wiedmaier learned of Priceline's purchase of OpenTable and began to investigate the status of his shares in the company.

45.     On October 1, 2018, counsel for Mr. Wiedmaier wrote to Booking Holdings[2] and OpenTable to redeem Mr. Wiedmaier's right to receive $103.00 for each share of OpenTable he held at the completion of Priceline's acquisition of OpenTable.  In the letter, Mr. Wiedmaier explained in detail how he had come to be given shares in OpenTable.  The letter attached declarations by Mr. Schell, OpenTable's Director of Strategic Accounts at the time of the share award; Mr. Burke, the General Manager of Marcel's in 2001 who attended the meeting where Mr. Templeton awarded Mr. Wiedmaier OpenTable shares; and Adnane Kebaier, a food runner at Marcel's who witnessed the fee award.  All three declarations were executed under penalty of perjury.

46.     A little over a month later, OpenTable refused Mr. Wiedmaier's demand.  The company claimed that it "conduct[ed] a thorough internal investigation" into the matter.  Yet its

---

[2] Priceline changed its name to Booking Holdings in 2018.

investigation did not include contacting Mr. Schell, its own former employee who attested to the

share award, or any of the other declarants.  Nor did it account for, or even acknowledge, that

Marcel's continues to receive the benefit of one of the two items that Mr. Templeton promised

Mr. Wiedmaier in exchange for Mr. Wiedmaier's continued use and promotion of OpenTable—

the fee reduction for certain reservations.

**CAUSES OF ACTION**

**COUNT ONE**
**(Breach of Contract)**
*Against Booking Holdings Inc.*

47.     Mr. Wiedmaier incorporates Paragraphs 1 through 46 as if set forth fully herein.

48.     In or around July 2014, Priceline made a tender offer to OpenTable's

shareholders, including Mr. Wiedmaier, to purchase all of the shares of common stock of

OpenTable at a price of $103.00 per share.  According to the tender offer, if Priceline completed

its acquisition of OpenTable, each outstanding share not tendered "will be converted into the

right to receive the Offer Price [$103.00], without any interest, less any applicable withholding

taxes."  On July 24, 2014, a sufficient percent of outstanding shares of OpenTable common stock

were tendered to Priceline, and Priceline completed its acquisition of OpenTable.

49.     Priceline's tender offer constituted a unilateral offer which Mr. Wiedmaier

accepted by attempting to redeem his shares, thus creating a binding contract between Mr.

Wiedmaier, on the one hand, and Priceline (now known as Booking Holdings), on the other hand

(the "Redemption Contract").

50.     Mr. Wiedmaier performed under the Redemption Contract by allowing his shares

to be cancelled, and attempting to redeem his right to receive the offer price of $103.00 per

share.

51.     Booking Holdings has breached the Redemption Contract by refusing to give Mr. Wiedmaier the offer price of $103.00 per share for each of Mr. Wiedmaier's 40,000 shares of common stock he held in OpenTable as of the date of Priceline's acquisition.  That breach of the Redemption Contract by Booking Holdings has directly and proximately caused harm to Mr. Wiedmaier by depriving him of the value of his shares in OpenTable and of his rights to receive $103.00 per share for each share he held in OpenTable as of the date of Priceline's acquisition of OpenTable.

52.     Mr. Wiedmaier has suffered, and will continue to suffer, compensatory harm and damages during the pendency of this action, in an amount to be proved at trial, but not less than $103.00 per share for each share he held in OpenTable as of the date of Priceline's acquisition of OpenTable, which is $4,120,000.00.

## COUNT TWO
### (Breach of Contract)
### *Against OpenTable, Inc. and Chuck Templeton*

53.     Mr. Wiedmaier incorporates Paragraphs 1 through 46 as if set forth fully herein.

54.     In the alternative to Count I, if Mr. Wiedmaier was never properly granted shares in OpenTable, Mr. Wiedmaier asserts this cause of action for breach of contract against OpenTable, Inc. and Chuck Templeton.

55.     At a meeting in Washington, D.C. in or around May 2001, OpenTable's CEO Chuck Templeton, on behalf of himself and OpenTable, promised Mr. Wiedmaier 40,000 shares in OpenTable, and a perpetual reduction of certain OpenTable fees, if Mr. Wiedmaier continued to use OpenTable at Marcel's.  Those promises by Mr. Templeton and OpenTable, and Mr. Wiedmaier's consideration in exchange for those promises—namely, his promise to continue using OpenTable at Marcel's—formed a binding express contract between Mr. Wiedmaier, on the one hand, and Mr. Templeton and OpenTable, on the other hand (the "Award Contract").

56.     Mr. Wiedmaier performed under the Award Contract by not terminating the restaurant's contract with OpenTable, as he had planned to do, and by continuing to use OpenTable at Marcel's.  He also continued to promote OpenTable.

57.     Mr. Templeton and OpenTable breached the Award Contract by failing to award Mr. Wiedmaier 40,000 shares in OpenTable.

58.     That breach of the Award Contract by Mr. Templeton and OpenTable has directly and proximately caused harm to Mr. Wiedmaier by depriving him of the value of the 40,000 shares of OpenTable.

59.     Mr. Wiedmaier has suffered, and will continue to suffer, compensatory harm and damages during the pendency of this action, in an amount to be proved at trial.

### COUNT THREE
### (Promissory Estoppel)
#### *Against OpenTable, Inc. and Chuck Templeton*

60.     Mr. Wiedmaier incorporates Paragraphs 1 through 46 as if set forth fully herein.

61.     In the alternative to Counts I and II, if Mr. Wiedmaier was never properly granted shares in OpenTable, Inc., and a valid contract to grant Mr. Wiedmaier shares in OpenTable was not formed between Mr. Wiedmaier, on the one hand, and OpenTable and Mr. Templeton, on the other hand, Mr. Wiedmaier asserts this cause of action for promissory estoppel against OpenTable and Chuck Templeton.

62.     At a meeting in Washington, D.C. in or around May 2001, OpenTable's CEO Chuck Templeton, on behalf of himself and OpenTable, clearly and unambiguously promised Mr. Wiedmaier 40,000 shares in OpenTable, and a perpetual reduction of certain OpenTable fees, if Mr. Wiedmaier continued to use OpenTable at Marcel's.

63.     In making these promises to Mr. Wiedmaier, Mr. Templeton and OpenTable each had a reasonable expectation that the promises would induce Mr. Wiedmaier to continue using OpenTable at Marcel's.

64.     Mr. Wiedmaier reasonably and foreseeably relied on the promises made by Mr. Templeton and OpenTable by continuing to use OpenTable's software at Marcel's.  He also continued to promote OpenTable in the Washington, D.C. region.

65.     The failure of Mr. Templeton and OpenTable to keep one of the promises made to Mr. Wiedmaier—namely, awarding him 40,000 shares in OpenTable—has caused an unconscionable injury to Mr. Wiedmaier through deprivation of the cash value of the 40,000 shares in OpenTable.

66.     Injury to Mr. Wiedmaier can be avoided by the enforcement of Mr. Templeton's and OpenTable's promise described above, or in the alternative, by awarding compensation for the financial loss described above in an amount to be proved at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Robert Wiedmaier respectfully requests that the Court:

a.     award compensatory damages to Plaintiff in in an amount to be determined at trial but not less than $4,120,000.00;

b.     grant the equitable relief described above in Count III;

c.     award pre- and post-judgment interest; and

d.     grant Plaintiff such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: April 16, 2019                    Respectfully submitted,


                                         */s/ William E. Jacobs*
                                         August J. Matteis, Jr. (D.C. Bar No. 408592)
                                         William E. Jacobs (D.C. Bar No. 1022356)
                                         Saul Cohen (D.C. Bar No. 1044818)
                                         WEISBROD MATTEIS & COPLEY PLLC
                                         1200 New Hampshire Ave., NW, Suite 600
                                         Washington, D.C. 20036
                                         Telephone:  (202) 499-7900
                                         Facsimile:  (202) 478-1795
                                         Email:      amatteis@wmclaw.com
                                                     wjacobs@wmclaw.com
                                                     scohen@wmclaw.com

                                         *Counsel for Plaintiff*